**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**
_____

DAWN NESEVITCH,

               Plaintiff,

      v.                              No. 3:15-CV-935
                                            (CFH)

CAROLYN W. COLVIN,
COMMISSIONER OF SOCIAL
SECURITY,

               Defendant.
_____

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

**APPEARANCES:**                           **OF COUNSEL:**

Lachman, Gorton Law Firm           PETER A. GORTON, ESQ.
P.O. Box 89
1500 East Main Street
Endicott, New York 13761-0089
Attorneys for Plaintiff

Social Security Administration       KATHRYN S. POLLOCK, ESQ.
Office of Regional General Counsel
Region II
26 Federal Plaza, Rm. 3904
New York, New York 10278
Attorneys for Defendant

**CHRISTIAN F. HUMMEL**
**U.S. MAGISTRATE JUDGE**

### MEMORANDUM-DECISION AND ORDER

     Plaintiff Dawn Nesevitch brings this action pursuant to 42 U.S.C. § 405(g)

seeking review of a decision by the Commissioner of Social Security ("Commissioner"

or "defendant") denying her applications for supplemental security income benefits

("SSI") and disability insurance benefits.  Dkt. No. 1 ("Compl.").  Plaintiff moves for a finding of disability, and the Commissioner cross moves for a judgment on the pleadings.  Dkt. Nos. 12, 19.  For the following reasons, the determination of the Commissioner is affirmed.[1]

## I. Background

Plaintiff, born on October 12, 1961, graduated from high school and was enrolled in regular education courses.[2]  T at 41-42.  Plaintiff worked as a housekeeper at a nursing home for twenty-one years.  Id. at 42.  Plaintiff protectively filed a Title II application for a period of disability and disability insurance benefits on May 10, 2012.  T at 146-52.  Plaintiff alleged a disability onset date of June 15, 2008.  Id. at 167.  This application was denied on July 19, 2012.  Id. at 85-90.  Plaintiff requested a hearing before an Administrative Law Judge ("ALJ") and a hearing was held on November 27, 2013.  T at 92, 33-70.  On April 23, 2014, ALJ Robert E. Gale issued his determination concluding that plaintiff was not disabled.  Id. at 15-28.  Plaintiff's timely request for review by the Appeals Council was denied, making the ALJ's findings the final determination of the Commissioner.  Id. at 1-6, 10.  Plaintiff commenced this action on

---

[1]   Parties consented to review of this matter by a Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Dkt. No. 13.

[2]   Plaintiff previously filed an application for disability insurance benefits, but that application was denied on April 26, 2012, and the denial was upheld on appeal.  T at 15; Nesevitch v. Colvin, 3:12-CV-969 (TJM) (N.D.N.Y. Sept. 12, 2013).  The ALJ in this case determined that, despite alleging an onset date of June 15, 2008, which "constitute[d] an implied request for reopening" of her earlier application, plaintiff has not satisfied any of the conditions for a reopening."  T at 15.  Plaintiff does not take issue with the ALJ's decision to decline reopening of her earlier application.

July 31, 2015.  Compl.

## II. Discussion

## A.  Standard of Review

In reviewing a final decision of the Commissioner, a district court may not determine de novo whether an individual is disabled.  See 42 U.S.C. §§ 405(g), 1383(c)(3); Wagner v. Sec'y of Health & Human Servs., 906 F.2d 856, 860 (2d Cir. 1990).  Rather, the Commissioner's determination will only be reversed if the correct legal standards were not applied, or it was not supported by substantial evidence. Johnson v. Bowen, 817 F.2d 983, 986 (2d Cir. 1987);  Berry v. Schweiker, 675 F.2d 464, 467 (2d Cir. 1982).  Substantial evidence is "more than a mere scintilla," meaning that in the record one can find "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  Halloran v. Barnhart, 362 F.3d 28, 31 (2d Cir. 2004) (citing Richardson v. Perales, 402 U.S. 389, 401 (1971) (internal citations omitted)).   The substantial evidence standard is "a very deferential standard of review . . . . [This] means once an ALJ finds facts, we can reject [them] only if a reasonable factfinder would *have to conclude* otherwise."  Brault v. Soc. Sec. Admin., Comm'r, 683 F.3d 443, 448 (2d Cir. 2012) (emphasis in original) (internal quotation marks omitted). Where there is reasonable doubt as to whether the Commissioner applied the proper legal standards, the decision should not be affirmed even though the ultimate conclusion reached is arguably supported by substantial evidence.  Martone v. Apfel, 70 F. Supp. 2d 145, 148 (N.D.N.Y. 1999) (citing Johnson v. Bowen, 817 F.2d 983, 986

3

(2d Cir. 1987)).  However, if the correct legal standards were applied and the ALJ's

finding is supported by supported by substantial evidence, such finding must be

sustained, "even where substantial evidence may support the plaintiff's position and

despite that the court's independent analysis of the evidence may differ from the

[Commissioner's]."  Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992) (citation

omitted); Venio v. Barnhart, 213 F.3d 578, 586 (2d Cir. 2002).


## B.  Determination of Disability[3]

"Every individual who is under a disability shall be entitled to a disability . . .

benefit . . . ."  42 U.S.C. § 423(a)(1).  Disability is defined as the "inability to engage in

any substantial gainful activity by reason of any medically determinable physical or

mental impairment . . . which has lasted or can be expected to last for a continuous

period of not less than 12 months."  Id. § 423(d)(1)(A).  A medically-determinable

impairment is an affliction that is so severe that it renders an individual unable to

continue with his or her previous work or any other employment that may be available

to him or her based upon age, education, and work experience.  Id. § 423(d)(2)(A).

Such an impairment must be supported by "medically acceptable clinical and laboratory

diagnostic techniques."  Id. § 423(d)(3).  Additionally, the severity of the impairment is

"based [upon] objective medical facts, diagnoses or medical opinions inferable from

---

[3] Although the SSI program has special economic eligibility requirements, the requirements for establishing disability under Title XVI, 42 U.S.C. § 1382c(a)(3)(SSI) and Title II, 42 U.S.C. § 423(d) (Social Security Disability Insurance ("SSDI")), are identical, so that "decisions under these sections are cited interchangeably."  Donato v. Sec 'y of Health and Human Services, 721 F.2d 414, 418 n.3 (2d Cir. 1983) (citation omitted).

[the] facts, subjective complaints of pain or disability, and educational background, age, and work experience." Ventura v. Barnhart, No. 04-CV-9018 (NRB), 2006 WL 399458, at *3 (S.D.N.Y. Feb. 21, 2006) (citing Mongeur v. Heckler, 722 F.2d 1033, 1037 (2d Cir. 1983)).

The Second Circuit employs a five-step analysis, based on 20 C.F.R. § 404.1520, to determine whether an individual is entitled to disability benefits:

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity.
>
> If he [or she] is not, the [Commissioner] next considers whether the claimant has a 'severe impairment' which significantly limits his [or her] physical or mental ability to do basic work activities.
>
> If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him [or her] disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a 'listed' impairment is unable to perform substantial gainful activity.
>
> Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he [or she] has the residual functional capacity to perform his [or her] past work.
>
> Finally, if the claimant is unable to perform his [or her] past work, the [Commissioner] then determines whether there is other work which the claimant could perform.

Berry, 675 F.2d at 467 (spacing added). The plaintiff bears the initial burden of proof to establish each of the first four steps. DeChirico v. Callahan,134 F.3d 1177, 1179-80 (2d Cir. 1998) (citing Berry, 675 F.2d at 467). If the inquiry progresses to the fifth step,

the burden shifts to the Commissioner to prove that the plaintiff is still able to engage in gainful employment somewhere.  Id. at 1180 (citing Berry, 675 F.2d at 467).

Next, an ALJ is to assess the degree of functional limitation, or the impact the claimant's mental limitations have on her "ability to function independently, appropriately, effectively, and on a sustained basis."  Id. § 404.1520a(c). The ALJ must assess the plaintiff's degree of functional limitation in four functional areas: (1) "[a]ctivities of daily living," (2) "social functioning," (3) "concentration, persistence, and pace," and (4) "episodes of decompensation."  Id. §§ 404.1520a(c)(3), 416.920a(c)(3).  The ALJ must "rate" the functional degree of limitation in each of these four areas as "[n]one, mild, moderate, marked [or] extreme."  Id. §§ 404.1520a(c)(4), 416.920a(c)(4).  If the ALJ finds the degree of limitation in each of the first three areas to be "mild" or better and identifies no episodes of decompensation, the ALJ "will generally conclude" that the plaintiff's impairment is "not severe."  Id. § 404.1520a(d)(1). Where the plaintiff's mental impairment is "severe," the ALJ must "determine if it meets or is equivalent in severity to a listed mental disorder."  Id. § 404.1520a(d)(2). "If yes, then the [plaintiff] is 'disabled.'"  Petrie, 412 F. App'x at 408 (quoting 20 C.F.R. § 404.1520a(d)(2)).  "In addition, an ALJ must set forth the crucial factors justifying his findings with sufficient specificity to allow a court to determine whether substantial evidence supports the decision."  Barringer v. Comm'r of Soc. Sec., 358 F. Supp. 2d 67, 72 (N.D.N.Y. 2005) (citing Ferraris v. Heckler, 728 F.2d 582, 587 (2d Cir. 1984)). However, a court cannot substitute its interpretation of the administrative record for that of the Commissioner if the record contains substantial support for the ALJ's decision.

6

See Yancey v. Apfel, 145 F.3d 106, 111 (2d Cir. 1998).  If supported by substantial

evidence, the Commissioner's finding must be sustained "even where substantial

evidence may support the plaintiff's position and despite that the court's independent

analysis of the evidence may differ from the [Commissioner's]."  Rosado v. Sullivan,

805 F. Supp. 147, 153 (S.D.N.Y. 1992).  The Court must afford the Commissioner's

determination considerable deference, and may not substitute "its own judgment for

that of the [Commissioner], even if it might justifiably have reached a different result

upon a de novo review."  Valente v. Sec'y of Health & Human Servs., 733 F.2d 1037,

1041 (2d Cir. 1984).


## C.  ALJ Decision

Applying the five-step disability sequential evaluation, the ALJ determined that

plaintiff met the insured status requirements of the Social Security Act through

December 31, 2013 and had not engaged in substantial gainful activity from June 15,

2008, the alleged onset date, through December 31, 2013.  T at 17.  The ALJ found at

step two of the sequential evaluation that plaintiff had the severe impairments of a

depressive disorder, an anxiety disorder, diabetes with peripheral neuropathy,

degenerative disc disease of the cervical and lumbar spine, and degenerative joint

disease of the right knee.  Id. at 18.  At step 3, the ALJ determined that plaintiff did not

have an impairment or combination of impairments that met or medically equaled the

severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1.

Id. at 19.  The ALJ then concluded that plaintiff retained the residual functional capacity

("RFC") to:

> perform light work as defined in 20 CFR 404.1567(b),[4]
> because the claimant was able to lift/or carry twenty pounds
> occasionally and ten pounds frequently, stand and/or walk
> for six hours in an eight-hour workday, and sit for six hours
> in an eight-hour workday.  The claimant was able to
> occasionally climb and kneel, and the claimant was able to
> frequently balance, stoop, crouch, and crawl.  Additionally,
> the claimant retained the ability to understand and follow
> simple instructions and directions, perform simple tasks with
> supervision and independently, maintain attention and
> concentration for simple tasks, regularly attend to a routine
> and maintain a schedule, relate to and interact appropriately
> with others in order to carry out simple tasks, and handle
> work-related stress in that she was able to make decisions
> directly related to the performance of simple tasks in a
> position with consistent job duties that did not require the
> claimant to supervise or manage the work of others.

Id. at 22.  At step 4, the ALJ determined that plaintiff was capable of performing her

past relevant work as a cleaner-housekeeper.  Id. at 26.  Considering plaintiff's RFC,

age, education, and work experience, together with the Medical-Vocational Guidelines,

the ALJ further concluded that there were other jobs existing in the national economy

that she was also able to perform.  Id. at 26-27.  Therefore, the ALJ determined that

plaintiff "has not been under a disability, as defined under the Social Security Act from

June 15, 2008, the alleged onset date, through December 31, 2013, the date last

---

[4]  "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of
objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category
when it requires a good deal of walking or standing, or when it involves sitting most of the time with some
pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of
light work, you must have the ability to do substantially all of these activities. If someone can do light work,
we determine that he or she can also do sedentary work, unless there are additional limiting factors such
as loss of fine dexterity or inability to sit for long periods of time." 20 C.F.R. § 404.1567(b). "Sedentary
work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like
docket files, ledgers, and small tools. Although a sedentary job is defined as one which involves sitting, a
certain amount of walking and standing is often necessary in carrying out job duties. Jobs are sedentary if
walking and standing are required occasionally and other sedentary criteria are met." Id. § 404.1567(a).

insured.  Id. at 28.

### D.  Relevant Medical Evidence

### 1.  Michael Wasco, M.D., Primary Care Physician

Dr. Wasco completed a "questionnaire" on December 18, 2013.  T at 410.  Dr. Wasco referred to an "attached note of 10/28/13" for plaintiff's diagnoses.  Id.  The attached note sets forth plaintiff's "active problems" as allergic rhinitis, asthma, benign essential hypertension, cervical disc degeneration, depression, diabetes mellitus, esophageal reflux, fatty liver, former smoker, Hepatitis B virus, hyperlipidemia, hypertension, localized primary osteoarthritis of the right knee, lumbrosacral disc degeneration, overweight, postmenopausal atrophic vaginitis, prolapsing mitral valve leaflet syndrome, sleep apnea, tinnitus of both ears, and vitamin D deficiency.  Id. at 415.  Dr. Wasco indicated that, if plaintiff "returned to repetitive work activity allowing for a sit-stand option," she would need more than one[5] ten-minute rest period per hour in addition to a thirty-minute lunch.  Id. at 410.  Dr. Wasco provided that plaintiff was likely to have a substantial number of absences from work, indicating more than four per month.  Id.

Due to pain and/or side effects of medication, Dr. Wasco concluded that

_____

[5]  One reading of Dr. Wasco's questionnaire could suggest that Dr. Wasco checked off that plaintiff needed one ten minute rest period per hour or less, as the check mark appears closest to this response.  T at 410.  However, plaintiff's counsel argues that Dr. Wasco indicated that plaintiff needed more than one 10 minute rest period per hour. Dkt. No. 12 at 7.  The ALJ read this record as plaintiff did, indicating that Dr. Wasco concluded that plaintiff required more than one ten-minute rest period per hour.  T at 25 ("Dr. Wasco assigns the claimant a wide variety of extremely significant limitations, including a need for more than one ten minute rest period per hour . . . .").  Thus, the Court will read this record in accordance with the ALJ's interpretation, as the parties do not contest this interpretation.

plaintiff's abilities to sustain concentration and work pace are "poor." T at 410.  The

side effects of plaintiff's medication are "poor concentration and fatigue – especially

psych meds." Id. at 411.  In an eight-hour work day, Dr. Wasco opined that plaintiff

could sit for two to four hours; should alternate between sitting and standing two to four

times per hour; should change positions approximately every ten minutes; could

stand/walk for two to four hours; and could lift up to five pounds for up to three hours

per day.  Id.  Dr. Wasco provided that plaintiff had a marked limitation – a greater than

33% loss, as defined by the questionnaire – in her abilities to: maintain attention and

concentration for extended periods; perform activities within a schedule; maintain

regular attendance, and/or be punctual within customary tolerances; sustain an ordinary

routine without special supervision; complete a normal work day and week without

interruptions from psychologically-based symptoms; perform at a consistent pace

without an unreasonable number and length of rest periods; interact appropriately with

the general public; accept instructions and respond appropriately to criticism from

supervisors; respond appropriately to ordinary stressors in the work setting; respond

appropriately to changes in the work setting; and getting along with coworkers or peers

without distracting them or exhibiting behavioral extremes.  Id. at 412-13.[6]  Dr. Wasco

provided that plaintiff would be likely to miss more than three work days per month due

---

[6]  The Court observes that it appears that Dr. Wasco initially checked the box for marked limitations, but wrote his initials and date this next to this choice, and checked off "none/mind," which appears to the undersigned to indicate that his final choice was "none/mild," as his initials are next to the "marked" box, rather than the "none/mild" box.  T at 413.  However, Plaintiff's counsel indicates that Dr. Wasco concluded that plaintiff had marked limitations in her ability to work with others. Dkt. No. 12 at 7, 15, 15 n.6.  It appears the ALJ interpreted this record in the same manner as plaintiff, as the ALJ indicated that Dr. Wasco provided "all marked psychological limitations."  T at 25.  Thus, the Court will read this record in accordance with the ALJ's interpretation, as the parties do not contest this reading.

to symptoms and treatment of her mental conditions.  Id.  Dr. Wasco diagnosed plaintiff with depression, sleep apnea, cervical degenerative disc disease, lumbar degenerative disc disease, and right knee degenerative disease.  Id. at 413.  Dr. Wasco reported that plaintiff experiences fatigue and decreased concentration as side effects of her medication.  Id.

Dr. Wasco completed a medical source statement on April 9, 2014 largely addressing plaintiff's physical limitations.  T at 452-57.  Dr. Wasco indicated that plaintiff was limited to occasionally lifting and carrying up to ten pounds.[7]  Id. at 452.  He provided that plaintiff could sit for four hours at one time without interruption, stand for two hours at one time without interruption, and walk for two hours at one time without interruption.  Id. at 453.  He provided that plaintiff could sit for a total of four hours in an eight-hour day, and stand and walk for a total of two hours each in an eight-hour day. Id.  Dr. Wasco indicated that plaintiff could occasionally – up to one third of the day – reach, handle, finger, peel, push, and pull with both hands.  Id. at 454.  He cited to plaintiff's degenerative disc disease in her cervical spine as support for such limitations. Id.  Dr. Wasco provided that plaintiff was limited to occasionally operating foot controls with both feet.  Id.  This limitation was attributed to plaintiff's degenerative disc disease in her lumbar spine.  Id.  Dr. Wasco answered that plaintiff could never climb ladders or crawl, and could occasionally climb stairs and ramps, balance, stoop, kneel, or crouch. Id. at 455.  Dr. Wasco provided that plaintiff could never tolerate exposure to

---

[7]  As plaintiff points out, the form did not provide an option for less than ten pounds.  Dkt. No. 12 at 8 n.1.

unprotected heights; moving mechanical parts; humidity or wetness; dust, fumes, and pulmonary irritants; extreme cold; extreme heat; or vibrations. Id. at 456. He answered that plaintiff could occasionally operate a motor vehicle and occasionally tolerate moderate "office" noise. Id. He indicated these limitations were due to plaintiff's diabetes with peripheral neuropathy.[8] Id.

Dr. Wasco provided that plaintiff could perform shopping, travel without a companion, ambulate without an assistive device, walk a block at a reasonable pace on rough or uneven surfaces, use standard public transportation, climb a few steps at a reasonable pace with use of a single hand rail, prepare a simple meal and feed herself, care for her personal hygiene, and sort/handle/use paper/files. T at 457. In response to a question that asked whether there were "any other work-related activities, which are affected by any impairments. And indicate how the activities are affected, what are the medical findings that support this assessment?", Dr. Wasco answered "Depression-Bipolar." Id. Dr. Wasco provided that plaintiff's limitations lasted/will last for twelve consecutive months. Id.

Dr. Wasco testified at a deposition held by plaintiff's council on September 19, 2014. T at 470-483. Dr. Wasco testified that plaintiff suffers from "asthma, hypertension, bipolar, diabetes, GERD, fatty liver, prior smoker, cholesterol issues, arthritis, right knee, back" and sleep apnea. Id. at 473. Dr. Wasco indicated that

---

[8] "Peripheral Neuropathy is dysfunction of one or more peripheral nerves (the part of a spinal nerve distal to the root and plexus). It includes numerous syndromes characterized by varying degrees of sensory disturbances, pain, muscle weakness and atrophy, diminished deep tendon reflexes, and vasomotor symptoms, alone or in any combination, initial classification is based on history and physical examination." THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1797-98 (19th ed. 2011).

obesity could exacerbate plaintiff's "arthritis and the weight bearing joints; back, hips, knees" and her "physical stamina." Id. at 476. Dr. Wasco provided that certain of plaintiff's medications – Abilify, Duloxetine, Lorazepan, and Trihexyphenidyl – could cause fatigue. Id. at 476. Dr. Wasco clarified that his statement in the questionnaire that plaintiff's concentration and work place were poor was due to her medication and pain. Id. at 477. He testified that he believed plaintiff would miss more than four days of work due to fatigue, "sleep apnea, sometimes that doesn't work as well. Medications themselves could cause fatigue, lethargy," and "Bipolar people tend to have issues with varying emotional type of thing." Id. He agreed that there may be some days where Bipolar Disorder could prevent plaintiff from being able to go to work. Id. Dr. Wasco indicated that plaintiff's "sugars have been under good control, and a number which is called the hemoglobin 1AC actually was excellent." Id. at 479. In a note written on a prescription pad, dated November 6, 2013, Dr. Wasco provides that "due to pt psych issues deemed disabled." Id. at 409.

### 2. Justine Magurno, M.D., Consultative Examiner

Dr. Justine Magurno performed an internal medicine consultative examination on June 29, 2012. T at 276-81. Plaintiff's chief complaint "was her back and then her knees." Id. at 276. At the examination, plaintiff rated her back pain as a one on a one-to-ten scale, but she indicated that her pain level is not consistent. Id. Her pain worsens with standing. Id. She indicated that her pain in her knees was currently a zero out of ten, but "it will hurt if she walks." Id. Plaintiff discussed her sleep apnea, for

which she treats with a CPAP,[9] which "does give her more energy and alertness during the day and prevents her from falling asleep at meetings, which she used to do." Id. Plaintiff reported carpal tunnel in her hands which causes pain her wrist, radiating to her shoulders bilaterally. Id. She had carpal tunnel release on her hands in 2001, but is not having any current treatment for carpal tunnel. Id. Her symptoms are triggered by activity, and the pain is described as soreness. Id.

Plaintiff discussed her type 2 diabetes, which was diagnosed in 2010. T at 276. Plaintiff's "[t]est strips run in the low 200s, around 124-130," which is "better sine she has lost about 13 pounds." Id. at 277. Plaintiff reported tingling and numbness in her feet. Id. Plaintiff has asthma, which is triggered by pollen, and is treated by "relaxing and taking deep breaths as she does not have any inhalers." Id. The frequency of her asthma "depend[s] upon her exposure levels." Id. Her doctor recently provided prescriptions for Xopenex and Advair, but plaintiff had not yet picked them up. Id. Plaintiff has a "prolapsed mitral valve," which causes palpitations when she is anxious or angry, but no syncops. Id. She is treated with verapamil. Id. She has vertigo when she bends, at night, or with neck movement. Id. She has a history of anxiety, depression, and bipolar disorder. Id. She smokes five cigarettes per day and five cigars per day. Id. at 277. Plaintiff reported cooking once per month, as her husband did most of the cooking; cleaning once per month; doing laundry once or twice per week; shops once per month; bathing and dressing daily; and watching television. Id.

---

[9] CPAP stands for continuous positive airway pressure therapy. See generally THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1905 (19th ed. 2011).

14

at 278.

Plaintiff appeared to be in no acute distress during the exam.  T at 278.  She had a normal gait, and was able to walk on her toes without difficulty.  Id.  She could not walk on her heels.  Id.  She could squat 1/3.  Id.  She had a wide stance.  Id.  She did not need help changing for the exam or getting on or off of the examination table.  Id.  She was able to rise from her chair without difficulty.  Id.  Dr. Magurno opined that plaintiff's CPAP was medically necessary.  Id.  Plaintiff had a "normal AP diameter.  Clear to asculation.  Percussion normal.  No significant chest wall abnormality."  Id.. at 279.  Plaintiff's cervical spine

> shows flexion/extension full, lateral flexion full, and rotary movement 70.  There is dorsal kyphosis at the very upper thoracic area.  No scoliosis or abnormality in thoracic spine.  Lumbar spine shows full flexion, extension 10 and she said, "ow," lateral flexion 15 and she said, "ow," and rotation 15.  SLR negative bilaterally.  Full ROM of shoulders.  Elbow flexion/extension and pronation full, supination 40.  Full ROM of wrists and forearms.  Full ROM of hips.  Knees right 3 to 90, left 0 to 120.  Ankles dorsiflexion right full, left 10; plantar flexion full bilaterally.  No evident sublaxtions, contractures, or ankylosis.  There is thickening of the bilateral knees.  Joints stable, but both knees are tender.  No redness, heat, swelling or effusion.

Id.  Plaintiff's DTRs were physiologic and equal in upper and lower extremities.  Id.  Her upper and lower extremities had a strength of five out of five.  Id.  Her left lower extremity proximal was five out of five, and left foot dorsiflexion was four out of five.  Id.  She had no cyanosis, clubbing, or edema in her extremities.  Id.  No significant cariscosities or tropic changes were evident.  Id.  She had no evident muscle atrophy.  Id.  Her hand and finger dexterity were in tact and she had a bilateral grip strength of

15

five out of five.  Id.

Dr. Magurno provided that plaintiff's prognosis was "poor."  T at 280.  Her medical source statement indicated that plaintiff had "marked limitations for squatting, stair climbing, lifting, and carrying; mild-to-moderate limitations for sustained walking and standing; mild limitations for fine motor activities, pushing, and pulling; no limitations for reaching or sitting."  Id.

### 3.  Kevin Duffy, Psy.D, Consultative Examiner

Dr. Duffy performed a psychiatric evaluation of plaintiff on June 29, 2012.  T at 271-275.  Dr. Duffy noted that plaintiff received outpatient treatment in the past at a crisis center and currently sees her psychiatrist once per month.  Id. at 271.  Plaintiff reported difficulty falling asleep and frequent waking.  Id.  She reported a loss of appetite and weight loss in the past several months.  Id.  Plaintiff has experienced crying spells, feelings of hopelessness, a loss of usual interests, fatigue and a loss of energy, feelings of worthlessness, a diminished self esteem, concentration difficulties, and a diminished sense of pleasure.  Id. at 271-72.  She expressed "some excessive apprehension and worry, irritability, hyperstartle response, restlessness, difficulty concentrating, muscle tension, flash backs, and hyper vigilance."  Id. at 272.  Plaintiff denied manic symptomology and thought disorder symptomology.  Id.  Plaintiff indicated that she has some concentration difficulties.  Id.

Plaintiff presented as cooperative with "generally adequate social skills."  T at 272.  She was dressed appropriately, with good personal hygiene and grooming.  Id.

She had a normal posture, normal motor behavior, and appropriate eye contact.  Id.

Her speech was intelligible and clear, and her expressive and receptive language were

adequate.  Id.  Her thought processes were "[g]enerally coherent and goal directed, with

no evidence of hallucinations, delusions, or paranoia in the evaluation setting."  Id.  Her

affect was "somewhat anxious and tense."  Id.  Her mood was dysthemic, her

sensorium was clear, she was oriented x3.  Id.  at 273.  Plaintiff's attention and

concentration appeared "at least mildly impaired" insofar as she was able to count, but

could not perform simple calculations or serial 3s.  Id.  Her recent and remote memory

skills were "at least mildly impaired" as she was able to name three objects immediately

and after five minutes; "perform the digits forward task at 2, 3, 4, and 5 numbers, but

not 6 or more"; and was "able to perform the digits backward task at 2 and 3 numbers,

but not 4 or more."  Id.  Plaintiff's cognitive function "was believed to be somewhat

below average.  General fund of information was appropriate to experience."  Id.

Plaintiff's insight and judgment were fair.  Id.

Plaintiff reported an ability to dress, bathe, and groom herself.  T at 273.  She

indicated that her husband cooks, and she does "some cleaning."  Id.  Plaintiff provided

that her husband does the shopping and laundry.  Id.  Her husband manages the

money.  Id. Plaintiff does not drive, and does not have a driver's license.  Id.  Plaintiff's

"[s]ocialization is reported to be okay.  Family relationships are reported to be good."

Id.  Plaintiff's hobbies and interests "include watching tv, listening to the radio a bit, and

walking at times.  Id.

In a medical source statement, Dr. Duffy concluded that plaintiff could

17

> follow and understand simple directions and instructions.
> The claimant can perform simple tasks independently. The
> claimant can maintain attention and concentration. The
> claimant is able to maintain a regular schedule. The
> claimant can learn new tasks. The claimant can perform
> complex tasks independently. The claimant can make
> appropriate decisions. The claimant may have difficulty
> relating adequately to others at times. The claimant may
> have some mild difficulties dealing appropriately with stress
> at times. The results of the examination appear to be
> consistent with psychiatric problems, although in itself, it is
> not clear that these are significant enough to interfere with
> the claimant's ability to function on a daily basis at this time.

T at 274. Dr. Duffy recommended continuing current psychological and psychiatric

treatment. Id. His prognosis was "[f]air at this time, given claimant's limited work

history." Id. Plaintiff was assessed to be able to manage her funds. Id. He indicated

that the results were "consistent with psychiatric problems, although in itself, it is not

clear that these are sufficient enough to interfere with the claimant's ability to function

on a daily basis at this time." Id.


### 4. Shamsuddin Rana, M.D., treating provider

Plaintiff treated with Dr. Shamsuddin Rana, generally on a yearly basis, for sleep

apnea issues. Dr. Rana diagnosed plaintiff with obstructive sleep apnea syndrome. T

at 388. Dr. Rana emphasized use of a nasal CPAP for six to seven hours per night. Id.

On August 2, 2012, plaintiff indicated that she was using her CPAP "'all night long,

sleeping well, better rested in the morning. She still nods off sometimes at supper and

may nap sometimes in the afternoon . . . .  Epworth Sleepiness Scale score is 8."[10]  Id.

at 389.  Dr. Rana emphasized "weight reduction, sleep hygiene, and regular use of

nasal CPAP for 6-7 hours per night."  Id.  In August 2013, Dr. Rana noted that plaintiff

"claims good compliance, but still has daytime hypersomnolence, which may very well

be related to use of multiple antidepressants and antipsychotic medication."  Id. at 400.

Plaintiff indicated that, in spite of using her CPAP for more than seven hours a night,

"she still feels sleepy during the day and will nod off when physically inactive and take

naps in the afternoon."  Id. at 399.  Dr. Rana noted that she has no compliance data

review available to her to assess plaintiff's claims of compliance.  Id.


### 5.  Nalini Tella, MD, Medical Consultant

Nonexamining agency consultant, Dr. Nalini Tella, M.D., performed a medical

evaluation/case analysis on October 2, 2012.  T at 380-385.  Dr. Tella concluded that

plaintiff could occasionally lift and carry twenty pounds, frequently lift and carry ten

pounds, sit and/or walk for about six hours in an eight-hour work day, sit with normal

breaks for about six hours in an eight-hour work day, and was unlimited in her

pushing/pulling abilities.  Id. at 381.  She further indicated that plaintiff could

occasionally climb ramps, stairs, ladders, ropes, and scaffolds; occasionally kneel; and

could frequently balance, stoop, crouch, and crawl.  Id. at 382.  Dr. Tella indicated that

---

[10]  The Epworth Sleepiness Scale "measures a person's general level of daytime sleepiness, or their average sleep propensity in daily life (ASP).  It is a simple questionnaire based on retrospective reports of the likelihood of dozing off or falling asleep in a variety of different situations."  See http://epworthsleepinessscale.com/ (last visited Sept. 26, 2016).  A score of ten or higher on the Epsworth Sleepiness Scale "suggests abnormal day time sleepiness."  THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1706 (19th ed. 2011) (table 177-3).

plaintiff had no manipulative, visual, communicative, or environmental limitations.  Id. at

382-83.  Dr. Tella concluded that plaintiff's hypertension, hyperlipidemia, obesity, sleep

apnea, and asthma were nonsevere impairments.  Id. at 385.

Dr. Tella concluded that plaintiff's "intermittent back pain/lumbrosacral strain"

was nonsevere.  T at 385.  Dr. Tella noted that plaintiff was treated for knee pain and

was diagnosed with degenerative joint disease involving the patellofemoral joint and

knee joint, and that a small effusion was noted on March 2011, but that "the more

recent evidence shows normal PFTs."  Id.  Dr. Tella observed that plaintiff continued to

smoke against medical advice.  Id.  Dr. Tella provided that a diagnosis of carpal tunnel

syndrome "has not been substantiated in the extensive treatment records.  The

claimant does not allege limitations from carpal tunnel syndrome.  Moreover, this is

based on more recent exam.  Therefore some weight is given to this opinion."  Id.  Dr.

Tella concluded that "[t]he established MDIs alone or in combination do not meet or

equal listing severity."  Id.  She further provided that plaintiff's current RFC is assessed

with an onset date of March 1, 2011, and plaintiff's "functional status from AOD to

2/28/11 is insufficient to assess an RFC."  Id.


### 6.  L. Meade, PhD., Psychological Consultant

L. Meade, a nonexamining medical evaluator, performed a review of plaintiff's

medical records on July 15, 2012.  T at 71-82.  Dr. Meade concluded that, "[b]ased on

the evidence the claimant retains the abilities to perform the activities of light duty, low

contact, low stress work that does not require repetitive squatting or stair climbing."  Id.

at 75.  Further, Dr. Meade concluded that plaintiff had no restrictions in her activities of daily living; mild difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence, or pace; and had no repeated, extended episodes of decompensation.  Id. at 76.  Dr. Meade concluded that the evidence did not establish the presence of paragraph "C" criteria.  Id.  Dr. Meade concluded that plaintiff "retains abilities to perform the activities and functions of low contact, low stress work." Id. at 77.  Dr. Meade further determined that plaintiff had difficulty understanding and had memory limitations, but that she was not significantly limited in her ability to remember locations and work-like procedures and remember very short and simple instructions.  Id. at 78.  Dr. Meade opined that plaintiff was moderately limited in her ability to understand and remember detailed instructions, and attributed this conclusion to a consultative examiner's determination that plaintiff had a mild impairment with memory.  Id.

Dr. Meade concluded that plaintiff had sustained concentration and persistence limitations, but that she was not significantly limited in her abilities to carry out very short and simple instructions and maintain attention and concentration for extended periods. T at 78.  Dr. Meade concluded plaintiff was moderately limited in her ability to carry out detailed instructions and perform activities within a schedule, maintain regular attendance, and be punctual in accordance with customary tolerances.  Id. at 78-79. She was not significantly limited in her abilities to sustain an ordinary routine without special supervision, work in coordination with or in proximity to others without being distracted by them, make simple work-related decisions, complete a normal workday

21

and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods.  Id. at 79.  Dr. Meade concluded that plaintiff had a mild impairment in her attention and concentration "per CE" and was reluctant to go out alone.  Id.

Dr. Meade concluded that plaintiff had social interaction limitations, but was not significantly limited in her abilities to: interact appropriately with the general public, ask simple questions or request assistance, get along with coworkers or peers without distracting them or exhibiting behavioral extremes, maintain socially appropriate behavior, and adhere to basic standards of neatness and cleanliness.  T at 79.  She was moderately limited in her ability to accept instructions and respond appropriately to criticism from supervisors.  Id.  Dr. Meade determined that plaintiff was moderately limited in her ability to respond appropriately to changes in the work setting.  Id.  She was not significantly limited in her abilities to be aware of normal hazards and take appropriate precautions, travel to unfamiliar places and use public transportation, and set realistic goals or make plans independently of others.  Id. at 79-80.  Dr. Meade determined that plaintiff "retains the abilities to perform activities and functions of low contact, low stress work."  Id. at 80.

## E.  Hearing Testimony

Plaintiff indicated that her "most significant medical condition that keeps [her] from working" is her depression and her bipolar disorder.  T at 48.  Her symptoms are anger, anxiety, and crying spells.  Id.  She experiences these symptoms once a month.

22

Id. at 49.  Plaintiff also indicated that she experiences depression on a daily basis.  Id. at 59.  She experiences feelings of anxiety once or twice per week.  Id.  She has no other condition that affects her ability to work since 2008.  Id. at 49.  She experiences side effects from her medication – dry mouth and headaches.  Id. at 50.  She reports that she does dishes, and her husband exclusively prepares meals and does grocery shopping.  Id.  Plaintiff takes care of her own personal hygiene.  Id. at 51.  Plaintiff maintains regular contact with her brother.  Id.  Plaintiff indicated that the maximum weight she could carry is twenty-five pounds.  Id. at 53.  She can walk approximately four blocks unassisted, but takes two breaks.  Id. at 53, 65.  She can sit for three to four minutes at a time before she needs to "change her posture completely."  Id. at 53.  She can stand for three to four minutes at one time before she needs to "completely get off [her] feet."  Id. at 53-54.  During a typical day, plaintiff goes for walks, visits with neighbors, or sleeps.  Id. at 54.  She reads the newspaper obituary section each day. Id. at 63.  She also reported regularly visiting her mother-in-law's home.  Id. at 61. Plaintiff indicated that she cannot handle money very well, so her husband handles it. Id.  at 55.  Plaintiff reported that she stopped looking for work in 2009.  Id.  She does not sleep well three to four nights per week due to worry.  Id. at 64.  She will take naps during the day for one to two hours at a time.  Id.  Plaintiff's need to take naps is due to depression, which started a week prior to the hearing.  Id. at 69.  Plaintiff reported that she cannot lift a gallon of milk because its too heavy.  Id. at 65.

## F.  Activities of Daily Living

Plaintiff reported in her activities of daily living form that her daily activities involve "listen[ing] to music[,] have breakfas [sic,] take medicin [sic], get dresed [sic,] go for walk[,] take a bath[,] then clean house and wash disehes [sic,] and do laundry, and feed cat, watch tv go to bed."  T at 181.  Plaintiff indicated that she can no longer make beds and "get[s] very frustraed [sic] doing work."  Id.  She indicates that her illnesses affects her sleep because she "get[s] depressed and get moody [sic] swings, and cry."  Id.  She has "no problem" dressing herself or taking care of her personal hygiene.  Id. at 181, 183.  Due to her conditions, she has "a hard time understanding and compredg [sic] what needs to be done, I have arthris [sic] in [her] back and legs."  Id. at 182.  Plaintiff indicated that she needs reminders to take medicine because she "sometimes loose [sic] concintration [sic], on what I'm [sic] am doing taking meds.  Forgetfull [sic]."  Id.  Plaintiff responded that she prepares meals "ever [sic] day with my husband" such as "macorni [sic] salad beans, mac & cheez [sic], lasona [sic] zita [sic]."  Id.  Relating to household work, plaintiff does "laudry [sic], half mow with my husband, cooking, dishes."  Id. at 184.  She needs help from her husband with mowing and with carrying laundry.  Id.  Plaintiff goes outside "every day if its [sic] possible."  Id.  She indicates that she walks, rides in a car, and uses public transportation.  Id.  When she goes out, her husband goes with her because she is "very prtective [sic] with my husband and myself. I have a fear of going alone."  Id. at 184-85.

Plaintiff shops in stores for groceries, clothing, and goes to the drug store.  T at 185.  She goes to the grocery store every two weeks, to the drug store once per month, and "go to the bank 2 hrs."  Id.  Plaintiff indicated that she is unable to pay bills, count

24

change, or handle a savings account, and her "husband handles the money, I can't do it, I'm slow, I get confused." Id. Plaintiff's hobbies include watching baseball on television, church, walking, working in the garden, and cooking. Id. She does these hobbies every day. Id. Since her illness/conditions began there have been "basicly [sic]" no changes in her ability to complete these activities. Id. at 186. In reporting her social activities, plaintiff indicates that she talks on the phone with others and visits with her mother and mother-in-law every day. Id. On a regular basis, plaintiff goes to church, visits her mother and mother-in-law, and "sometimes" goes to baseball games. Id. She reports visiting with others every day. Id. Plaintiff indicated that she has no problem getting along with family, friends, neighbors, or others. Id. In response to a question asking whether there have been changes in her social activities since her illness/conditions began, plaintiff responded, "I become very depressed and angry, cry a lot [sic], moody." Id.

Regarding her physical limitations, plaintiff provides that her lifting is affected by her "bad back, bad knees." T at 186. With regard to standing, her "foot hurt, can [sic] stand too long, back hurts." Id. In response to walking limitations, plaintiff answered, "walking every day." Id. at 187. In response to sitting limitations, plaintiff answered, "not appled [sic]." Regarding her ability to climb stairs, plaintiff responded, "legs hurt, do [sic] to arthrits [sic]." Id. Regarding kneeling, plaintiff provided, "knees hurt." Id. As to squatting, "feet hurt, knees hurt, arm hurts." Id. Relating to her ability to reach, plaintiff indicated, "arm hurts, can't hold anything for to [sic] long." Id. Regarding her use of hands, plaintiff answered, "same above." Id. Regarding her vision, plaintiff

indicated that she "can't see distance away, and close up." Id. As to her hearing, plaintiff provided, "can't hear to [sic] good loud noises scare me." Id. As for talking, plaintiff responded, "talk a lot." Id. Plaintiff provided that she could walk for one block before needing a ten minute rest. Id. at 188. She indicated that she has problems concentrating, but can finish what she starts. Id. Plaintiff provides that she can follow spoken instructions, "but forget sometimes." Id. She indicated that she can follow written instructions." Id. She reported no problems getting a long with bosses, teachers, police, landlords, or other people in authority. Id. Plaintiff reported that she never lost a job due to problems getting along with others. Id.

Plaintiff indicated that stress or changes in her schedule affect her because she "become very confused, and I can't concintrate [sic] on what I'm doing." T at 189. She answered that she has trouble remembering things because she "forget a lot [sic] with my memory, I can't rember [sic]." Id. Regarding her symptoms of pain, plaintiff provided that in her back and knees she has a stabbing and "ace" feeling. Id. at 190. She provided that she has pain in her back, knees, and legs that does not radiate. Id. Plaintiff indicated that her pain is "there all the time" and she experiences it "every day, when it rains I get it a lot [sic] in my knees & legs and back." Id. Plaintiff has pain when walking and "doing work at home." Id. She takes medicine for the pain, and it "soothes it, takes the pain away makes it feel better. 2 hrs." Id. The pain medication causes dry mouth. Id. at 191. She provided that her current daily activities include walking, talking on the phone, and visiting. Id. Her pain has not impacted her daily activities. Id.

## G.  Parties' Arguments

Plaintiff contends that the ALJ erred insofar as he: (1) concluded that plaintiff's sleep apnea was not a severe impairment, (2) improperly assessed the weight to be accorded to the various medical opinions in the record in reaching his RFC assessment.  See generally Dkt. No. 12.  Defendant argues that substantial evidence supports the ALJ's determination.  See generally Dkt. No. 19.

### 1.  Severity of Sleep Apnea

Plaintiff argues that the ALJ misread the medical records to conclude that her sleep apnea was nonsevere.  Dkt. No. 12 at 9-10.  Defendant contends that the ALJ properly concluded that her sleep apnea was nonserve.  Dkt. No. 19 at 7.  Substantial evidence supports the determination that plaintiff's sleep apnea was not a severe impairment.

The claimant bears the burden of presenting evidence establishing severity. Miller v. Comm'r of Soc. Sec., No. 05-CV-1371, 2008 WL 2783418, at *6-7 (N.D.N.Y. July 16, 2008); see also 20 C.F.R. § 404.1512(a).  In determining the severity of a mental impairment, the ALJ must apply the "special technique" set out in 20 C.F.R. § 404.1520a.  Where the ALJ recognizes that a claimant has a "medically-determinable mental impairment,"

> the ALJ must 'rate the degree of functional limitation resulting from the impairment(s) in accordance with paragraph (c),' which specifies four broad functional areas: (1) activities of daily living; (2) social functioning; (3) concentration, persistence, or pace; and (4) episodes of decompensation. 20 C.F.R. § 404.1520a(c)(3). The first

> three areas (i.e., activities of daily living; social functioning; and concentration, persistence, or pace) are rated on a five-point scale: '[n]one, mild, moderate, marked, and extreme.' 20 C.F.R. § 404.1520a(c)(4).

Piazza v. Colvin, No. 13-CV-2230 JS, 2014 WL 4954598, at *8 (E.D.N.Y. Sept. 30, 2014).  Although the Second Circuit has held that this step is limited to "screen[ing] out de minimis claims," Dixon v. Shalala, 54 F.3d 1019, 1030 (2d Cir.1995), the "mere presence of a disease or impairment, or establishing that a person has been diagnosed or treated for a disease or impairment" is not, by itself, sufficient to render a condition "severe."  Coleman v. Shalala, 895 F.Supp. 50, 53 (S.D.N.Y.1995); Bergeron v. Astrue, No. 09-CV-1219 (MAD), 2011 WL 6255372, at *3 (N.D.N.Y. Dec. 14, 2011). Thus, the severity of an impairment is determined by the limitations imposed by the impairment, and not the diagnosis.  Ellis v. Comm'r, 11-CV-1205, 2012 WL 5464632, at *4 (N.D.N.Y. Sept. 7, 2012) accord., McConnell v. Astrue, 03-CV-0521, 2008 WL 833968, at *12 (N.D.N.Y. Mar. 27, 2008).  Indeed, a "finding of 'not severe' should be made if the medical evidence establishes only a 'slight abnormality' which would have 'no more than a minimal effect on an individual's ability to work.'"  Rosario v. Apfel, No. 97-CV-5759, 1999 WL 294727, at *5 (E.D.N.Y.  Mar. 19,1999) (quoting Bowen v. Yuckert, 482 U.S. 137, 154 n. 12 (1987)).

> As pertinent here, basic work activities are "the abilities and aptitudes necessary to do most jobs," including: "[p]hysical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling," as well as "[u]nderstanding, carrying out, and remembering simple instructions; [u]se of judgment; [r]esponding appropriately to supervision, co-workers and usual work situations; and [d]ealing with changes in a routine work setting."

Chavis v. Colvin, No. 5:12-CV-1634, 2014 WL 582253, at *2 (N.D.N.Y. Feb.13, 2014) (quoting 20 C.F.R. § 404.1521(b) (1), (3)-(6)). At step two, the claimant bears the burden to provide medical evidence demonstrating the severity of his condition. See 20 C.F.R. § 404.1512(a); Bowen, 482 U.S. at 146.

Generally, where an ALJ finds that a claimant has at least one severe impairment at step two and continues with her analysis through the sequential evaluation, reviewing both severe and nonsevere impairments, a failure to find that some impairments were severe is not reversible error. See generally Reices-Colon v. Astrue, 523 F. App'x 796, 798 (2d Cir. 2013) (holding an error in failing to identify a severe impairment is harmless if that impairment is considered during the subsequent steps); Hall v. Colvin, 7:12-CV-1733 (GLS), 2014 WL 411543, at *2 (N.D.N.Y. Feb. 3, 2014); Bender v. Astrue, 09-CV-880 (TJM/VEB), 2010 WL 5175023 (N.D.N.Y. Nov. 29, 2010); 20 C.F.R. § 416.945(a)(2) ("We will consider all of your medically determinable impairments of which we are aware, including your medically determinable impairments that are not 'severe,' . . . when we assess your [RFC]."). "When the parties disagree over the effect of the ALJ's failure to include a condition at step two, resolution of 'this issue comes down to a question of whether there was substantial evidence to support the ALJ's conclusion that [the omitted condition] should not be included as 'severe impairment.'" Eralte v. Colvin, No. 14 CIV. 1745 JCF, 2014 WL 7330441, at *10 (S.D.N.Y. Dec. 23, 2014) (quoting Hussain v. Com'r of Soc. Sec., No. 13 Civ. 3961, 2014 WL 4230585, at *7 (S.D.N.Y. Aug. 27, 2014) (citing 42 U.S.C. § 405(g)); Paz v. Comm'r of Soc. Sec., No. 14-CV-6885 (MKB), 2016 WL 1306534, at *14 (E.D.N.Y. Mar.

29

31, 2016) ("[W]here an ALJ's decision to exclude an impairment from the list of severe impairments is not supported by substantial evidence, and the ALJ fails to account for any functional limitations associated with the omitted impairments in determining the claimant's RFC, a court must remand for further administrative proceedings.") (citing Parker-Gross v. Astrue, 462 F. App'x 16, 17 (2d Cir. 2012)).

At the hearing, plaintiff testified that she did not sleep well and took naps during the day.  T at 64.  However, plaintiff indicated that her taking naps was a recent occurrence, starting the week prior, and her need to nap was due to depression.  Id. at 69.  Further, plaintiff testified that she does not sleep well three to four nights out of the week due to "worry," rather than as a result of her sleep apnea.  Id. at 64.  Dr. Rana, who managed plaintiff's CPAP treatments on a yearly basis, opined in that plaintiff's daytime drowsiness may be due to medication side effects, rather than from her sleep apnea.  Id. at 399-400.  Plaintiff reported to Dr. Rana in August 2012 that she was sleeping better and felt well-rested when she woke in the morning.  Id. at 389.  In addition, Dr. Rana noted that plaintiff had a score of 8 on the Epworth Sleepiness Scale, which does not rise to the level of "abnormal daytime sleepiness."  Id. at 389; THE MERCK MANUAL OF DIAGNOSES AND THERAPY 1706 (19th ed. 2011) (table 177-3).

In making his severity determination, the ALJ relied in part on the opinion of the impartial medical consultant, Dr. Tellani, who determined, after review of plaintiff's medical records, that plaintiff's sleep apnea was nonsevere.  T at 385.  Dr. Tella also noted that, at the time, plaintiff had continued to smoke against medical advice.  Id.  Dr Tella's opinion incorporated plaintiff's report to consultative examiner Dr. Magurno that

plaintiff's CPAP treatment gives her "more energy and alertness during the day and prevents her from falling asleep at meetings, which she used to do. Id. at 276. Dr. Wasco reported that plaintiff's fatigue was due to her medications and sleep apnea. Id. at 413, 477. The Second Circuit, in response to a similar argument regarding the severity of a claimant's sleep apnea, noted that an ALJ could properly consider the fact that medical evidence supported the conclusion that a claimant's drowsiness was caused by factors other than his sleep apnea. Wavercak v. Astrue, 420 F. App'x 91, 93 (2d Cir. 2011).

The ALJ did not conclude, as plaintiff suggests, that plaintiff's sleep apnea "does not continue," Dkt. No. 12 at 10, but that it has no more than a minimal impact on her ability to perform basic work activities. The ALJ considered plaintiff's sleep apnea diagnosis and reported symptoms and treatment notes in assessing her RFC. He considered plaintiff's claims of daytime naps and sleepiness and her reports to the consultative examiners regarding the effectiveness of her CPAP treatment. T at 19. Although there may exist substantial evidence to support a finding that plaintiff's sleep apnea was a severe impairment, substantial evidence exists in the record to support the ALJ's conclusion that it is nonsevere. Rosado v. Sullivan, 805 F. Supp. 147, 153 (S.D.N.Y. 1992). Therefore, remand is not required on this basis. See Eralte, 2014 WL 7330441, at *10. However, even if plaintiff's sleep apnea were a severe impairment, the ALJ proceeded past step two to consider her claim, considering all medically determinable impairments throughout the sequential evaluation. T at 23. Courts have found that any error in the ALJ's analysis at step two is harmless where the ALJ found

claimant had other severe impairments, and continued beyond step two.  See Stanton

v. Astrue, 370 F. Appx. 231, 233 n.1 (2d Cir. 2010).  For these reasons, plaintiff's

motion on this ground is denied.


### 2.  Residual Functional Capacity Determination

With respect to the ALJ's RFC determination, plaintiff argues that the ALJ

improperly evaluated the opinion evidence of record.  Dkt. No. 12 at 10-25.  Specifically,

plaintiff argues that ALJ violated the treating physician rule by assigning "reduced

weight" to her treating physician Dr. Wasco's opinion; great weight  to the opinions of

Dr. Tella, the nonexamining agency consultant; and significant weight to consultative

examiners Dr. Magurno, Dr. Duffy, and medical consultant Dr. Meade.  Dkt. No. 12 at

18-19.  Further, she argues that the ALJ's RFC is not supported by substantial evidence

insofar as he: (1) concluded that plaintiff could maintain adequate work pace, attention,

concentration, or attendance; (2) concluded that plaintiff could perform the exertional

requirements of light work; and (3) failed to incorporate a limitation for low-contact, low-

stress work.  See generally Dkt. No. 12.  The Commissioner argues that Dr. Wasco's

opinion was not entitled to controlling weight as it conflicted with substantial evidence in

the record, and that substantial evidence supports the ALJ's RFC determination.  Dkt.

No. 19 at 8-20.  The Court agrees with the Commissioner.

Controlling weight will be given to a treating source's opinion on the nature and

severity of a claimant's impairments where it is "well-supported by medically acceptable

clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence."  20 C.F.R. § 416.927(c)(2); see Halloran v. Barnhart, 362 F.3d

28, 32 (2d Cir. 2004); see also Snell v. Apfel, 177 F.3d 128, 133 (2d Cir. 1999) ("When

other substantial evidence in the record conflicts with the treating physician's opinion,

however, that opinion will not be deemed controlling. And the less consistent that

opinion is with the record as a whole, the less weight it will be given.").  When a treating

source's opinion is given less than controlling weight, the ALJ is required to consider the

following factors: the length, nature and extent of the treatment relationship; the

frequency of examination; evidentiary support offered; consistency with the record as a

whole; and specialization of the examiner.  See 20 C.F.R. § 416.927(c)(2)-(6).  Even if a

treating physician's opinion is deemed not to be deserving of controlling weight, an ALJ

may nonetheless give it "extra weight" under certain circumstances.  Thus, the ALJ

should consider the following factors when determining the proper weight to afford the

treating physician's opinion if it is not entitled to controlling weight: (1) length of the

treatment relationship and the frequency of examination, (2) nature and extent of the

treatment relationship, (3) supportability of opinion, (4) consistency, (5) specialization of

the treating physician, and (6) other factors that are brought to the attention of the court.

See C.F.R. § 404.1527(d)(1)-(6); de Roman v. Barnhart, 03Civ.0075 (RCC/AJP), 2003

WL 21511160, at *9 (S.D.N.Y. July 3, 2003); Shaw v. Chater, 221 F.3d 126,134 (2d Cir.

2000); Clark v. Comm'r of Soc. Sec., 143 F.3d 115, 118 (2d Cir.1998); Schaal v. Apfel,

134 F.3d 496, 503 (2d Cir. 1998).  The Second Circuit has stated that it will "not

hesitate to remand when the Commissioner has not provided 'good reasons' for the

weight given to a treating physician's opinion and we will continue remanding when we

encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion." Halloran, 362 F.3d at 33; Brogan-Dawley v. Astrue, 484 F. App'x 632, 633 (2d Cir. 2012). However, "where the evidence of record permits [the court] to glean the rationale of an ALJ's decision," the ALJ need not "have mentioned every item of testimony presented to him [or her] or have explained why he [or she] considered particular evidence unpersuasive or insufficient to lead him [or her] to a conclusion of disability." Petrie v. Astrue, 412 F. Appx. 401, 407 (2d Cir. 2011).

Although the Second Circuit has cautioned that "ALJs should not rely heavily on the findings of consultative physicians after a single examination," Selian v. Astrue, 708 F.3d 409, 419 (2d Cir. 2013), where the treating physician's opinion conflicts with substantial evidence in the record, a consultative examiner's opinion may constitute substantial evidence to contradict the opinion of a treating physician. Mongeur v. Heckler, 722 F.2d 1033, 1039 (2d Cir. 1983). Thus, "an ALJ may give greater weight to a consultative examiners opinion than a treating physician's opinion if the consultative examiner's conclusions are more consistent with the underlying medical evidence." Suarez v. Colvin, 102 F. Supp. 3d 552, 577 (S.D.N.Y. 2015) (citing cases); Leisten v. Colvin, 12-CV-6698 (FPG), 2014 WL 4275710, at *12-14 (W.D.N.Y. Aug. 28, 2014) (holding that the ALJ properly awarded the treating physician's opinion little weight and substantial weight to the consultative examiners' opinions because the treating physician's opinion was inconsistent and unsupported, whereas the consultative opinions were supported by their examination results).

The opinion of a nonexamining source, such as a state agency medical or psychological consultant, is generally entitled to less weight than an examining source. 20 C.F.R. § 416.927.  However, a nonexamining sources' opinions may override that of an examining source "provided they are supported by evidence in the record."  Schisler v. Sullivan, 3 F.3d 563, 568 (2d Cir. 1993) (citing 20 C.F.R. § 404.1527(f), 416.927(f)); Diaz v. Shalala, 59 F.3d 307, 313 n.5 (2d Cir. 1995) ("[T]he opinions of nonexamining sources [can] override treating sources' opinions provided they are supported by evidence in the record."); Garrison v. Comm'r of Soc. Sec., No. 08-CV-1005, 2010 WL 2776978, *4 (N.D.N.Y. June 7, 2010) ("It is well settled that an ALJ is entitled to rely upon the opinions of both examining and non-examining State agency medical consultants, since such consultants are deemed to be qualified experts in the field of social security disability." (citing 20 C.F.R. §§ 404.1512(b)(6), 404. 1513(c), 404. 1527(f)(2), 416. 912(b)(6), 416. 913(c), 416.927(f)(2)) (additional citation omitted).

### i.  Mental Limitations

### a.  Work pace, Attention, Concentration, Attendance

Plaintiff contends that the ALJ failed to account for her limitations with concentration, persistence, and pace that are caused by her pain, physical impairments, sleep problems, and medication side effects.  Dkt. No. 12 at 10-12.  She contends that the ALJ should have accorded greater weight to Dr. Wasco's limitations due to his status as a treating physician and due to his consistency with Dr. Duffy and Dr. Meade's findings of limitations in these functional areas.  Id. at 11.  She argues that

Dr. Wasco's findings of marked limitations are consistent with Dr. Duffy's finding that plaintiff's "cognitive symptomology and deficits include some concentration difficulties," and Dr. Meade's conclusion that plaintiff had moderate impairments in maintaining concentration, persistence, and pace; performing activities within a schedule; and maintaining regular attendance or being punctual within customary tolerances.  Id.

Dr. Wasco indicated that plaintiff's ability to maintain concentration and sustain work pace was poor.  T at 410.  He indicated that plaintiff had poor concentration, which was "especially" due to her "psych. meds."  Id. at 411.  Dr. Wasco indicated marked limitations in plaintiff's abilities to maintain attention and concentration for extended periods, perform activities within a schedule, maintain attendance/be punctual, sustain an ordinary routine, and complete a normal work day/week without interruptions from psychological symptoms and perform at a consistent pace without unreasonable rest periods.  Id. at 412.  Dr. Wasco further provided that plaintiff was "disabled" from her "psyc. issues."  Id. at 409.

Although Dr. Wasco is plaintiff's treating provider, substantial evidence supports the ALJ's determination to decline to accord controlling weight, or greater weight, to Dr. Wasco's findings of marked limitations in these areas.  See Hallorhan, 362 F.3d at 32. The ALJ accurately characterized Dr. Wasco's extreme limitations as unsupported by clinical and diagnostic evidence.  T at 26.  Dr. Wasco's treatment notes repeatedly indicated that plaintiff was oriented, alert, and verbal.  T at 290, 293, 296,  309, 318, 324, 327, 329, 429, 433, 446, 459, 461.  Even when Dr. Wasco noted, during two visits, that plaintiff was in a "melancholic mood," he still indicated that she had intact cognition.

36

Id.  Further, as with her relatively normal mental status examinations with Dr. Wasco, at her examination with consultative examiner Dr. Duffy, plaintiff was "cooperative and presented with generally adequate social skills," her speech was fluent and clear, she had adequate expressive and receptive language, her dress and grooming were appropriate, she was fully oriented, and her thought processes were generally coherent and directed.  Id. at 273.  Although Dr. Wasco appeared at a deposition hosted by plaintiff's counsel, Dr. Wasco did not discuss in detail his reasons for concluding that plaintiff had marked limitations in all of these areas of mental functioning.  Id. at 470-79. Where a treating physician's treatment notes did not corroborate the physician's restrictive limitations, and were contradicted by other medical evidence, the Second Circuit has held that an ALJ may properly decline to accord that treating provider's opinion significant weight.  Kennedy v. Astrue, 343 F. App'x 719, 721 (2d Cir. 2009). Further, "the opinion of a treating physician, or any doctor, that the claimant is 'disabled' or 'unable to work' is not controlling," since these statements are not medical opinions, but "opinions on issues reserved to the Commissioner."  Rivera v. Colvin, 15 Civ. 3857 (AJP), 2015 WL 9591539, at *14 (S.D.N.Y. Dec. 18, 2015) (internal quotation marks and citations omitted).  As  required by 20 C.F.R. § 404.1527(c)(2), the ALJ properly gave "good reasons" for ascribing limited weight to the degree of limitations found by Dr. Wasco as his marked limitations in concentration, persistence, and pace are not supported by his treatment records or the opinions of other medical experts.  T at 25.

Despite contending that the ALJ inappropriately accorded great weight to Dr. Duffy and Dr. Meade's opinions due to their statuses as a consultative and agency

consultant, plaintiff argues that the ALJ committed error in declining to accord greater restrictions relating to these functions because of the reports to Dr. Duffy and Dr. Meade. Dkt. No. 12 11-12. Although Dr. Duffy and Dr. Meade noted some difficulties in concentration, persistence, and pace, neither doctor concluded that plaintiff was incapable – thus, had marked limitations – in performing these functions. T at 75, 271-75. Dr. Duffy concluded that plaintiff had "at least mildly impaired" attention and concentration as well as recent and remote memory skills. Id. at 273. Dr. Meade concluded that plaintiff had moderate limitations in these abilities, but determined that plaintiff was "not significantly limited" in her ability to remember locations and work-like procedures, as well as very short, simple instructions. Id. at 74, 78. Dr. Meade attributed his conclusion to Dr. Duffy's determination that plaintiff had a mild impairment with memory. Id. Although plaintiff argues that the ALJ should have considered Dr. Duffy and Dr. Meade's findings of at least mildly impaired and moderately impaired limitations as consistent with Dr. Wasco's findings of marked limitations, this argument is rejected for two reasons. Dkt. No. 12 at 11. First, the RFC adequately reflects Dr. Duffy's opined mild limitations and Dr. Meade's moderate limitations, as the ALJ limits plaintiff to simple tasks with consistent job duties – requirements that would fall within mild or moderate limitations for someone who retained the capacity to remember simple instructions and work procedures. T at 22, 78. Second, although the consultative doctors' findings of some level of limitation in concentration, persistence, pace support a conclusion that such impairments *exist*, it does not follow that their findings of mild and moderate limitations necessarily serve to support Dr. Wasco's more restrictive

conclusion that these limitations are marked as his proposed limitations suggest that plaintiff had a complete inability to complete these functions.  Id. at 412-13.

Plaintiff takes issue with the ALJ's according significant weight to Dr. Duffy's findings relating to these mental limitations.  Dkt. No. 12 at 21.  Plaintiff argues that Dr. Duffy's conclusion of "at least mild limitations" in attention and concentration and in recent and remote memory skills "is so non-specific and equivocal as to be essentially useless and certainly cannot be said to constitute substantial evidence."  Id.  She contends that this conclusion "provides a minimum level of impairment, but does not address her maximum functioning level, which is what a residual functional capacity must assess."  Id.  She argues that this error is compounded by the fact that Dr. Duffy concluded that "it is not clear that these [psychiatric problems] are significant enough to interfere with the claimant's ability to function on a daily basis at this time."  Id. (citing T at 274).

A doctor's use of "phrases such as "moderate' or 'mild' does not render a doctor's opinion vague or non-substantial for purposes of an ALJ's RFC determination."  Garner v. Colvin, 6:14-CV-602 (GLS), 2015 WL 5537688, at *5 (N.D.N.Y. Sept. 18, 2015).  Although the Second Circuit, in Curry v. Apfel, 209 F.3d 117, 123 (2d Cir. 2000) superceded on other grounds 20 C.F.R. § 404.1560(c)(2), held that mere statements that a claimant has "mild" or "moderate" limitations, "without additional information" are "so vague as to render [the opinions] useless"; here, Dr. Duffy's findings that plaintiff had "at least mild limitations" are not provided without additional information.  T at 272-74.  They were supplied with his extensive examination that indicated that plaintiff was

able to: count, but unable to perform simple calculations or the serial threes task; name three objects immediately and after five minutes; perform the digits forward task up to five numbers, but could not perform it at six or more; and perform the digits backward task at two and three numbers, but not four or more numbers.  Id.; Tankisi v. Comm'r of Soc. Sec., 521 F. App'x 29, 34 (2d Cir. 2013) (concluding where examining physician's statements of "mild to moderate" limitations were supported by a history of the patient and physical examinations, as well as "additional clarifying information" regarding the limitations," the examiner's use of "mild to moderate" was not impermissibly vague); see also Caci v. Colvin, 5:14-CV-1407, 2015 WL 9997202, at *10 (N.D.N.Y. Dec. 22, 2015) (concluding that, consultative examiner's conclusion that the plaintiff had "moderate to severe" limitations in standing, walking, and climbing were not unreasonably vague where this conclusion was "well-supported and based on a thorough examination"); Brown v. Comm'r of Soc. Sec., 3:15-CV-685, 2016 WL 3351021, at *7 (N.D.N.Y. June 14, 2016) ("The court notes that, unlike physical limitations, mental limitations are often categorized as 'mild,' 'moderate', or 'severe.'")(citing cases).  Further, even if Dr. Duffy's conclusion that plaintiff was "at least mildly impaired" in attention, concentration, and recent and remote memory skills was vague, the ALJ concluded that plaintiff had *moderate* restrictions in concentration, persistence, or pace.  T at 21.  Thus, as ALJ incorporated a limitation *greater than* that proposed by Dr. Duffy, any error in relying on a vague description of attention and concentration limitations would be harmless.

Plaintiff also argues that Dr. Duffy's statements are internally inconsistent as he indicates that plaintiff is "at least mildly impaired" with attention and concentration, but

then concludes that she can maintain attention and concentration without limitation. Dkt. No. 12 at 21. Dr. Duffy's conclusion that plaintiff has mild limitations in attention and concentration within his mental status examination, and then determining, in his medical source statement, that plaintiff can maintain attention and concentration is not internally inconsistent. T at 272-274. It is reasonable to conclude that a person can maintain attention and concentration if he has only mild limitations in this area. Further, even if this conclusion did amount to an inconsistency, as noted, the ALJ interpreted Dr. Duffy's findings as suggesting mild limitations, rather than no limitations in attention and concentration. Id. at 21. Thus, the ALJ did not read Dr. Duffy's opinion as concluding that plaintiff had no limitations in attention and concentration, as plaintiff suggests. Id.; Dkt. No. 12 at 21.

Plaintiff next argues that the RFC does not account for her limitations in work pace, attention, concentration, or attendance. Dkt. No. 12 at 10-12. In concluding that the plaintiff had moderate limitations in concentration, persistence, or pace, the ALJ limited plaintiff to: performing and maintaining concentration for simple tasks, following simple instructions/directions, regularly attending to a routine and maintaining a schedule, relating appropriately with others to carry out simple tasks, and handling work stress relating to performance of simple tasks with consistent job duties that did not require supervision or management of others' work. T at 22. Dr. Duffy further concluded that plaintiff could maintain a schedule, maintain attention and concentration, perform simple tasks independently, and understand simple tasks and instructions. T at 273-74. The ALJ's RFC appropriately incorporates these mild limitations.

Plaintiff further argues that the ALJ failed to account for her fatigue caused by sleep apnea and medication side effects in reaching his RFC. Dkt. No. 12 at 10. The ALJ concluded that plaintiff retained the ability to maintain attention and concentration, regularly attend to a routine, and maintain a schedule. T at 22. However, the ALJ limited plaintiff to simple tasks and routine work with no management or supervisory duties. Id. The ALJ acknowledged plaintiff's testimony that she "has problems sleeping" and "takes frequent naps throughout the day." Id. at 23. The ALJ also considered plaintiff's other reported activities of daily living. Id. at 22-23. Although the ALJ did not account for any greater limitations caused by fatigue, his failure to do so is not reversible error as record evidence does not support that plaintiff's fatigue caused significant limitations and supports that she could adequately maintain attention, concentration, and pace necessarily to perform basic work activities. The treatment notes indicated that plaintiff was always oriented, alert, and her cognition was in tact. T at 290, 309, 312, 318, 321, 324, 327, 329, 433, 446, 459, 461. According ly, the ALJ's RFC determination insofar as it relates to plaintiff's ability to sustain concentration, persistence, and pace, and the weight he accorded to the various medical opinions in reaching that determination, is supported by substantial evidence.

### b. Low Contact, Low Stress Work

Plaintiff contends that the ALJ erroneously declined to incorporate limitations into the RFC relating to low-stress, low-contact work, despite that: (1) he gave "significant weight" to Dr. Meade's opinion which concluded that plaintiff should be limited to low

contact, low stress work, and (2) Dr. Wasco found that plaintiff had marked limitations in socialization and handling stressors in the work setting. Dkt. No. 12 at 15; T at 413. The ALJ concluded that plaintiff could "relate to and interact appropriately with others in order to carry out simple tasks" and limited plaintiff to job duties "that did not require the claimant to supervise or manage the work of others." T at 22.

Plaintiff correctly observes that both Drs Duffy and Meade concluded that plaintiff had limitations in handling stress. Dkt. No. 12 at 15-16. Dr. Meade concluded that plaintiff had moderate limitations in remembering and understanding detailed instructions and had "sustained concentration and persistence limitations," but concluded that she was "not significantly limited" in remembering locations and work-like procedures and very short and simple instructions; thus, Dr. Meade determine that plaintiff retained the abilities to perform light duty, low-stress, low-contact work. T at 75, 78. Dr. Duffy indicated that plaintiff "may have difficulty relating adequately with others at times." Id. at 274. The ALJ acknowledged Dr. Meade's findings that plaintiff had the ability to perform low contact, low stress work. Id. at 24. Although Dr. Wasco determined that plaintiff would have marked limitations in responding appropriately to ordinary stressors or changes in the work setting, id. at 413, these significant limitations conflict with the other mental assessments of record and were unsupported by Dr. Wasco's treatment notes indicating intact cognition, alertness, full orientation, and full cognition. Id. at 290, 293, 296, 309, 318, 321, 324, 327, 329, 429, 433, 446, 459. Because Dr. Wasco's opinion regarding marked limitations in these areas is in conflict with medical treatment notes and lesser limitations opined by other medical experts, the

ALJ's decision to accord his opinion reduced weight is supported by substantial evidence. As noted, the ALJ limited plaintiff to work with simple instructions, simple tasks, consistent job duties, and to handle work-stress as it related to those simple tasks. Id. at 22. These limitations sufficiently take into account Dr. Duffy and Dr. Meade's determinations Id. at 75, 78, 274.

As to low-contact work, Dr. Wasco concluded that plaintiff had a marked inability to interact with the general public, accept instructions or respond appropriately to criticism from supervisors, get along with coworkers or peers without distracting them or exhibiting behavioral extremes. T at 412-13. Substantial evidence supports the ALJ's determination to decline to accord more than "reduced weight" to these findings. Id. at 25. Plaintiff indicated that she visits with neighbors, her mother, and her mother-in-law on a daily basis. Id. at 54. She maintains contact with her brother, who lives close to her. Id. She regularly goes to church, the grocery store, the bank, and the drug store; and sometimes goes to baseball games. Id. at 185. She provides that she has no problem with authority figures and has never lost a job due to her inability to relate to others. Id. at 187. Dr. Duffy's consultative report indicates that plaintiff reported her socialization to be "okay," and reflects that plaintiff "may have difficulty relating adequately with others at times." Id. at 273-74. Dr. Duffy's conclusion of difficulty relating with others "at times" does not support Dr. Wasco's conclusion that plaintiff had marked limitations in this area as this lesser degree of impairment does not suggest an almost complete inability to relate to others, as Dr. Wasco's marked finding suggests. Id. at 273-274, 412-43. The ALJ limited plaintiff to jobs that do not require supervision

44

or management of others.  Id. at 22.  As substantial evidence supports the ALJ's

determination that plaintiff had mild difficulties in social functioning, his decision to

decline to impose a low contact limitation in his RFC, but limit plaintiff to jobs that did

not require supervision or management of others, is supported by substantial evidence.

T at 21.


### b.  Physical Limitations

Plaintiff argues that the ALJ erred in concluding that she was capable of the

physical requirements of light work.  Dkt. No. 12 at 12.  Defendant argues that the ALJ's

assessment of plaintiff's physical limitations is supported by substantial evidence.  Dkt.

No. 19 at 9-17.  Again, the Court agrees with the Commissioner.

In April 2014, Dr. Wasco concluded that plaintiff could never crawl or climb

ladders or scaffolds, and could occasionally climb stairs and ramps, balance, stoop,

kneel, or crouch.  T at 455.  Dr. Wasco limited plaintiff to lifting up to five pounds up to

one third of the work day.  Id. at 411.  He further limited plaintiff to occasional operation

of foot controls and occasional use of hands.  Id. at 454.   Dr. Wasco provided that

plaintiff could sit for up to four hours at a time without interruption, totaling up to four

hours in a work day.  Id.  She could stand for up to two hours at a time without

interruption, for a total of two hours in a work day.  Id.  Dr. Wasco concluded that

plaintiff could walk for two hours at a time without interruption for a total of two hours in

a work day.  Id.   By contrast, in December 2013, Dr. Wasco indicated that plaintiff

needed a sit/stand option and needed more than one ten minute rest period per hour.

Id. at 410.

Regarding Dr. Wasco's conclusions relating to plaintiff's physical limitations, the ALJ provided specific reasons for according Dr. Wasco's conclusions about plaintiff's physical limitations reduced weight.  T at 25.  First, the ALJ notes that Dr. Wasco's conclusion that plaintiff was unable to tolerate respiratory irritants was contradicted by record evidence.  Id. at 19, 25.  As to the remainder of Dr. Wasco's opined physical limitations, the ALJ indicates that these findings are inconsistent with  (1) "claimant's testimony at the hearing where she stated that the only serious medical conditions that limited her ability to work were mental impairments, rather than physical impairments," and (2) "Dr. Wasco's treatment notes [which] consistently show conservative treatment with clinical findings of intact cognition, intact gait, normal sensation, and normal orientation, mood and affect[,]" including October 2013 treatment notes indicating that "claimant was stable."  T at 25.

Addressing first, Dr. Wasco's extreme limitation that plaintiff could never be exposed to respiratory irritants, T at 456, the ALJ noted that Dr. Wasco's conclusions conflicted with the fact that plaintiff's records demonstrated that plaintiff did not require treatment for her asthma even when continued to smoke for several years against medical advice, and that she had normal pulmonary function tests.  Id. at 25, 385.  This conclusion is further supported by the fact that plaintiff was not taking medication for asthma and had not needed to use her rescue inhaler, and that, although Dr. Rana apparently had prescribed plaintiff's asthma medications, plaintiff had not picked them up.  Id. at 277, 392.  Accordingly, substantial evidence supports the ALJ's decisions to

reject Dr. Wasco's opinion insofar as it related to respiratory irritants and to decline to incorporate such limitations into the RFC.

Substantial evidence further supports the ALJ's determination to decline to accord greater weight to Dr. Wasco's remaining opined physical limitations. Although Dr. Wasco indicated that plaintiff should only occasionally reach, handle, finger, feel, and push or pull, plaintiff's medical examinations demonstrate full grip strength and full strength in upper and lower extremities. T at 454. The only evidence of trouble with her hands is a reference to plaintiff's carpal tunnel, but, as Dr. Magurno and Dr. Tella noted, there was no evidence of carpal tunnel treatment or problems after plaintiff underwent a release in 2001. T at 276, 385. In her consultative exam, her hand and finger dexterity were reported to be in tact, with five out of five bilateral grip strength. Id. at 279. Next, Dr. Wasco's limitation of only occasional use of foot controls is also unsupported by the record. Id. Although plaintiff reported knee pain on two occasions 2011, on examination in 2012, she had five out of five upper and lower extremity strength in her right leg, and in her left leg had "proxmial 5/5, left foot dorsiflexion 4/5." T at 279, 305, 309. Dr. Wasco noted pain in the right knee, decreased range of motion with discomfort, and a limp when walking in September 2011, an "obvious limp" in November 2011, and a slight limp when walking in December 2011. T at 305, 309, 314. X-rays were negative, but an MRI led to a diagnosis of degenerative joint disease in the right knee. Id. at 306. After December 2011, no medical treatment records demonstrate a limp or problems with the knee, and her gait and station were consistently reported as intact or normal with no musculoskeletal symptoms. Id. at 417,

433, 446, 448, 450, 461.

Plaintiff argues that it is unclear, since the ALJ gave significant weight to the findings of both Dr. Tella and Dr. Magurno, "how or why Dr. Tella's limitations should trump those of Dr. Magurno or why Dr. Magurno's assessed limitations should not be incorporated into the RFC determination (particularly when they're supported by the opinion of treating physician, Dr. Wasco and when Dr. Magurno performed an actual examination)." Dkt. No. 12 at 18-19. Dr. Magurno concluded that plaintiff had marked limitations in squatting, climbing stairs, lifting, and carrying. T at 280. Dr. Magurno determined that plaintiff had moderate/mild limitations in sustained walking/standing. Id. She concluded plaintiff had mild limitations for fine motor activities, pushing, and pulling. Id. Dr. Magurno concluded that plaintiff had no limits on sitting/reaching. Id. The ALJ discounted Dr. Magurno's conclusions regarding limitations for fine motor activities and pushing and pulling as inconsistent with Dr. Magurno's examination, which showed five out of five strength in lower extremities, intact hand and finger dexterity, and five out of five grip strength in upper extremities. T at 25. This is supported by substantial evidence. See, e.g., Pellam v. Astrue, 508 F. App'x 87, 90 (2d Cir. 2013); Walker v. Colvin, 3:15-CV-465 (CFH), 2016 WL 4768806, at *10 (N.D.N.Y. Sept. 13, 2016) ("[A]n ALJ may properly 'credit those portions of a consultative examiner's opinion which the ALJ finds supported by substantial evidence of record and reject portions which are not so supported.' This is true even where the ALJ relies on a consultative examiner's examination findings, but rejects the consultative examiner's medical source statement setting forth 'moderate to severe limitations.'") (quoting

Viteritti v. Colvin, No. 14-CV-6760 (DRH), 2016 WL 4385917, at *11 (E.D.N.Y. Aug. 17, 2016) and citing Pellam, 208 F. App'x at 90). As for lifting and carrying restrictions, although Dr. Magurno and Dr. Wasco indicated marked limitations in these abilities, this is contradicted by plaintiff's own testimony that she was able to lift up to twenty-five pounds. T at 53. An ALJ, who is "in the best position to interpret and assess plaintiff's testimony regarding [her] ability to lift," can properly rely on a plaintiff's own testimony regarding this ability. Salmini v. Comm'r of Soc. Sec., 371 F. App'x 109, 114 (2d Cir. 2010). Further, medical expert Dr. Tella opined that plaintiff could lift up to twenty pounds frequently, and ten pounds occasionally. T at 381. The ALJ credited Dr. Tella's assessment as to these limitations, which is appropriate as the assessment is consistent with plaintiff's testimony regarding her abilities. Id. at 53. Thus, substantial evidence supports the ALJ's determination that plaintiff could lift and carry twenty pounds occasionally, and ten pounds frequently. Salmini, 371 F. App'x at 114.

Further, as to Dr. Wasco's proposed limitations regarding sitting, standing, and walking, lthough the ALJ rejected Dr. Wasco's more limiting conclusions regarding plaintiff's sitting and walking abilities, which opined that plaintiff could sit for four hours at one time for a maximum of four hours per day, stand for two hours at one time for a maximum of two hours per day, and walk for two hours at one time for a maximum of two hours per day,[11] substantial evidence supports his determination. T at 25. Although Dr. Wasco observed plaintiff walking with a limp at two medical appointments

---

[11] Dr. Wasco did not answer the portion of the questionnaire that asked him to provide the medical or clinical findings supporting his assessment of his proposed sitting, standing, and walking limitations. T at 453.

49

due to knee pain, no other follow appointments indicate limping or knee pain. T at 305, 309. At all other medical appointments and examinations, plaintiff was repeatedly reported as having normal gait. Id. at 278, 319, 321, 324, 327, 329, 429, 4 33, 446, 459, 461. The only medical record that supports plaintiff complaining of back pain resulted in Dr. Wasco's conservative treatment recommendation of using hot packs, Tylenol, and exercise, and advised her to return in six months. Id. at 395-96. Although an ALJ cannot discount a treating physician's opinion for recommending a conservative treatment regimen, Burgess v. Astrue, 537 F.3d 117, 129 (2d Cir. 2008), an ALJ could consider conservative treatment, such as taking over-the-counter medication for pain management "in conjunction with other substantial evidence to help support a conclusion that she was not disabled." Ortis Torres v. Colvin, 939 F. Supp. 2d 172, 183 (N.D.N.Y. 2013) (citing Burgess, 537 F.3d at 129). In addition to Dr. Wasco's conservative treatment, at her consultative examination, plaintiff reported having pain at a level of one out ten, and knee pain at a level of zero out of ten, indicating that these levels change. Id. at 276.

Moreover, Dr. Wasco's conclusion regarding plaintiff's need for breaks while sitting, walking, and standing as well as her need to change positions is internally inconsistent. Specifically, in his December 2013 assessment, Dr. Wasco indicated that plaintiff needed to alternate between sitting and standing two to four times per hour and needed to change positions every ten minutes, which is inconsistent with his 2014 opinion that plaintiff could sit for four hours at one time without breaks and sit and stand each for two hours at a time without breaks. Id. at 411, 453. Further, Dr. Magurno's

determined that plaintiff had no limitations in sitting, and, at most, moderate limitations in standing and walking.  Id. at 280.  Accordingly, substantial evidence supports the ALJ's determination to decline to incorporate limitations on sitting, standing, and walking beyond limiting plaintiff to performing light work.

For all of the reasons discussed herein, substantial evidence supports the ALJ's physical RFC determination, and, furthermore, the ALJ provided good reasons for the weight he accorded to the various medical opinions relating to these limitations. Although plaintiff may disagree with the ALJ's interpretation of the evidence, as substantial evidence supports the determination reached here, it must be upheld.  See, e.g., Bonet ex rel. T.B. v. Colvin, 523 F. App'x 58, 59 (2d Cir. 2013) ("[W]hether there is substantial evidence supporting the appellant's view is not the question," instead the question to be answered by the Court is "whether substantial evidence supports the ALJ's decision.").

### III.  Conclusion

Having reviewed the administrative transcript and the ALJ's findings, for the reasons stated herein, the undersigned concludes that the Commissioner's determination is supported by substantial evidence.  Accordingly, it is hereby:

**ORDERED**, that

The Commissioner's decision denying disability benefits is **AFFIRMED**; and it is further

**ORDERED**, that plaintiff's motion for judgment on the pleadings (Dkt No. 12) is

**DENIED**; and it is further

ORDERED, that defendant's cross-motion for judgment on the pleadings (Dkt.

No. 19) is **GRANTED**; and it is further

ORDERED, that the Clerk of the Court serve copies of the decision on the parties in

accordance with Local Rules.

**IT IS SO ORDERED.**

Dated: September 30, 2016
　　　Albany, New York

Christian F. Hummel
U.S. Magistrate Judge